UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
26-58 (JNE)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | ) | |
| | ) | |
| ANTHONY JAMES KAZMIERCZAK, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its position and memorandum on sentencing. The United States respectfully recommends a sentence of 14-months' imprisonment, the high-end of the applicable Guidelines range of 8 to 14 months, as a sentence that is sufficient but not greater than necessary to comply with the Section 3553(a) sentencing factors.

**RELEVANT FACTS AND PROCEDURAL BACKGROUND**

The United States agrees with and incorporates by reference the facts from the August 18, 2026 Final PSR (ECF 32, PSR ¶¶ 5-17), as well as the facts in the plea agreement (ECF 28, ¶ 2). In summary, in late January 2026, the defendant attended an official Town Hall meeting in north Minneapolis, Minnesota, hosted by United States Representative Ilhan Omar. During the meeting, Rep. Omar called for then-Department of Homeland Security (DHS) Secretary Kristi Noem to resign. The defendant, who was seated in the front row of the audience in attendance, stood up suddenly, and he quickly approached Rep. Omar at the front of the room, where she was speaking.



The defendant had a syringe in his hand, and as he approached Rep. Omar, he sprayed her with liquid from the syringe, and shouted, “She’s not resigning. You’re splitting Minnesotans apart.”




The liquid sprayed by the defendant from the syringe landed on Rep. Omar’s jacket. A security guard interviewed by the FBI said he saw droplets of the liquid on Rep. Omar’s face, and Rep. Omar told the FBI that she also felt the liquid on her hand. Lab analysis determined the liquid contained acetic acid and identified it as a mixture of water and apple cider vinegar.

The defendant gestured at Rep. Omar while backing away, and he was tackled to the floor by a security officer from Rep. Omar’s security detail. The defendant was

escorted out of the room by security officers and out the back door of the building, and Minneapolis Police (MPD) were summoned. As an MPD officer approached him, the defendant spontaneously stated, "I squirted vinegar." The Town Hall meeting was briefly interrupted, but Rep. Omar continued the meeting and her remarks.




WATCH: Man sprays unknown substance at Rep. Ilhan Omar during Minneapolis town hall

The FBI's investigation determined that the defendant had planned the assault on Rep. Omar for weeks, and he anticipated that his conduct at the meeting would likely result in his arrest. For example, he ordered a ticket to the Town Hall meeting two weeks in advance, he sent text messages to associates showing a screenshot of his ticket, and he sent text messages to at least three associates over several days up until the Town Hall with vague indicators that he planned to do something at the meeting that involved Rep. Omar, but he would not answer their questions about his intent.

The defendant also sent text messages to his neighbor to arrange for dog care and contact with a bail bond company if he was arrested at the meeting. While at the Town Hall shortly before it started, the defendant sent text messages to the same neighbor stating that he was the first attendee to arrive, parked at the end of the lot, and he sent a picture of the inside of the Town Hall from his vantage point. When the neighbor asked the defendant about his plans, i.e., "OK, what the hell are you planning to do????," the defendant cryptically responded that he was "covering bases," and sent a link to the neighbor for a livestream of the Town Hall meeting.

FBI forensic analysis of the defendant's computer showed the defendant conducted online searches of, among other things, Rep. Omar; protests of democrats; private security detail measures; apple cider vinegar, mustard, or other compounds/chemicals; syringes; bail bond companies; GoFundMe fundraising procedures and strategies; defense attorneys; and potential charging statutes for assaulting a public official or spraying water or another substance on someone.

The day after the assault, the United States charged the defendant by criminal Complaint with one-count of felony Assaulting a United States Officer, in violation of 18 U.S.C. § 111(a)(1), which carries a statutory maximum of 8 years' imprisonment.[1] (ECF 1, 1-1; PSR ¶ 101) The Court ordered the defendant detained after an evidentiary preliminary and detention hearing, finding the "allegations in the Complaint set out exceedingly serious and dangerous circumstances of the alleged

[1] The Hennepin County Attorney's Office also charged the defendant with one count of felony threats of violence and one count of misdemeanor fifth-degree assault arising from the same incident. (PSR ¶ 40) Those charges remain pending. (Id.)

assault of Rep. Omar at an official Town Hall." (ECF 9, 12) In late February 2026, a grand jury returned a one-count Indictment charging the defendant with the same felony charge. (PSR ¶ 1; ECF 13)

While in federal custody, the defendant enlisted the aid of a friend to retrieve information from his residence and start a GoFundMe campaign to raise money for his defense. At the defendant's direction, the friend located handwritten notes inside a compartment of his iPad case containing the defendant's lists of pre-offense planning topics. One list included items such as "medications," "service dog," "water," and "mustard." Another list included items such as "GoFundMe," "compelling story," "fundraising page," "what happened," "where happened," "how funding will be used," "heartwarming story," "Twin Cities bail bond," and "Stop Spreading Hate!" The defendant explained to his friend that some of those notes were the main points from a video he had watched on how to write a compelling GoFundMe fundraiser. On February 13, 2026, the defendant's friend posted a GoFundMe fundraiser on the defendant's behalf seeking donations to cover legal fees, bail expenses, and other costs associated with his arrest and detention. The GoFundMe page indicated that the defendant went to the Town Hall meeting attended by Rep. Omar because "[h]er anti-police, pro undocumented immigrant stances didn't sit well with me. . . " and "thinking [he] might heckle or question her. That is not how it went, however." The defendant's friend turned over the materials to the FBI upon the FBI's request.

On May 7, 2026, the defendant pleaded guilty to the one-count Indictment, pursuant to a plea agreement. (PSR ¶ 2; ECF 27, 28) The plea agreement

contemplated a possible dispute regarding the applicability of the Zero-Point Offender two-level adjustment. (ECF 28, ¶ 7.e.)

On August 18, 2026, the United States Probation Office issued a final PSR, finding the total offense level to be 11 and criminal history category to be I,[2] resulting in an advisory Guidelines' range of 8 to 14 months' imprisonment. (PSR ¶¶ 30, 38, 102) The PSR found that the two-level reduction for the Zero-Point Offender provision did not apply, because the defendant used a credible threat of violence in connection with the offense. (PSR ¶ 28; USSG § 4C1.1(a)(3))

The Guidelines range determined by the PSR did not differ from that contemplated by the plea agreement. (PSR ¶ 108; ECF 28, ¶ 7.g.)

## ARGUMENT

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the

---

[2] The PSR also determined the defendant has a total criminal history score of 0. (PSR ¶ 38)

need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence. *United States v. Masood*, 133 F.4th 799, 809 (8th Cir. 2025); *United States v. Dennis*, 131 F.4th 913, 917 (8th Cir. 2025).

### A. The Guidelines Calculations

The United States agrees with the PSR's calculated total offense level of 11, criminal history category of I, and Guidelines range of 8 to 14 months. The defendant, however, argues that the Zero-Point Offender two-level reduction should apply because he asserts that there is no evidence of a credible threat of violence. (PSR Add. p. A.2) The PSR correctly notes that the term "credible threat of violence" is not defined in the comments to the Guidelines and there is limited case law regarding the applicability of USSG § 4C1.1, because the provision was only recently promulgated in November 2023. (Id.)

The government need only show facts supporting a Guidelines enhancement by a preponderance of the evidence. *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008). The Zero-Point Offender provision under USSG § 4C1.1 affords a defendant with a criminal history score of 0 an additional two-level reduction if the defendant meets 10 criteria, including, as applicable here, that "the defendant did

not use violence or credible threats of violence in connection with the offense." USSG § 4C1.1(a)(3). Section 4C1.1 does not define "credible threats of violence."

The PSR referred to other similar provisions in determining that the defendant used a credible threat of violence in connection with the offense, including those that assert that the threat need not be expressly made, that the conduct would place a reasonable person in fear, and that the possibility of violence may be inferred from the totality of the circumstances of the threat. (PSR Add. pp. A.2 – A.3)

The same holds true for the analogous "true threats" context. A "true threat" is speech "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 358 (2003). A true threat is "for the fact-finder to determine in the context of the totality of the circumstances in which the communication was made." *United States v. Ivers*, 967 F.3d 709, 718 (8th Cir. 2020). "[T]he communication must be viewed in textual context and also in the context of the totality of the circumstances in which the communication was made." *United States v. Dierks*, 978 F.3d 585, 589 (8th Cir. 2020). *See United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000) (noting that "to determine whether a true threat exists," the alleged threat must be viewed "in light of its entire factual context"). True threats are proscribed because they subject individuals to fear of violence and the many kinds of disruption that fear itself engenders. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

Here, the defendant's conduct constituted a credible threat of violence because it reasonably placed Rep. Omar (and other in attendance at the Town Hall) in fear of imminent bodily harm. The defendant aggressively approached Rep. Omar, yelled at her, and sprayed her with a then-unknown liquid from a syringe, placing her and others in the immediate vicinity in fear of imminent bodily harm—i.e., a credible threat of violence. (PSR Add. at A.3) Given the recent expansive spate of political violence throughout the nation and in the District of Minnesota, such fear was quite reasonable. (Id.) The reaction of Rep. Omar's bodyguard tackling the defendant to the ground also shows that the defendant's act constituted a credible threat of violence. Indeed, in the defendant's written statement for acceptance of responsibility, he stated to Rep. Omar, "I'm sorry if I scared you." Moreover, as noted by the PSR, the defendant was charged in Hennepin County with Threats of Violence and Fifth-Degree Assault, for threatening to commit a crime of violence with intent to terrorize another and for an act intended to cause fear of immediate bodily harm. The totality of the circumstances shows by a preponderance of the evidence that the defendant's conduct constituted a credible threat of violence, and the defendant is therefore not entitled to the two-level Zero-Point Offender reduction under USSG § 4C1.1.

Accordingly, the United States advocates for a sentence of 14-months' imprisonment, the high-end of the applicable Guidelines range, as a sentence that is sufficient but not greater than necessary to comply with the § 3553(a) sentencing

factors. Additionally, the United States agrees with and recommends the conditions of supervision suggested in the PSR. (PSR ¶¶ 105-111).

### B. The Section 3553(a) Factors

A consideration of the § 3553(a) factors amply supports a sentence of 14 months' imprisonment as a sentence that is sufficient but not greater than necessary.

#### 1. Nature and Circumstances of the Offenses

As noted above, the defendant's act was a serious offense, attacking an elected United States Representative during an official Town Hall meeting with constituents present. Political violence has recently exploded nationwide and in the District of Minnesota with the recent horrific shootings and murders of state representatives and legislators. The defendant's assault of Rep. Omar was "exceedingly serious and dangerous" as the Court noted in the Order for Detention. The defendant also extensively planned the assault and but for the mostly benign liquid he squirted on Rep. Omar, the result of his crime could have been significantly worse. The nature and circumstances of the defendant's crime readily warrant a sentence of 14 months' imprisonment.

#### 2. History and Characteristics of the Defendant

The United States submits that the PSR accurately and adequately describes the defendant's criminal history, personal history, and characteristics. The defendant is 56 years old and has a dated criminal history that consists primarily of driving while impaired offenses. (PSR ¶¶ 35-37) The defendant's parents divorced when he was only eight years old, but he maintained good and close relationships

with both parents after the divorce, and the defendant still maintains regular contact with his elderly mother, who apparently suffers from dementia. The defendant experienced physical abuse as a child from his stepmother, which the defendant attributes to his bouts of depression as a youth. The defendant also experienced academic difficulties due to this dysfunctional relationship with his stepmother, which led to a psych eval when he was only 14 and temporary placement at a juvenile facility. The defendant also left his father's and stepmother's home when he was 16 and lived on his own, eventually obtaining work in the computer industry.

The defendant's political views apparently frayed his relationships with his children and they stopped communicating with him entirely after he committed his instant crime against Rep. Omar. The defendant was also in a serious car accident which had physical and mental health impacts, and led him to leave the workforce two years later, and ultimately obtain long-term social security disability payments. The defendant also has long-term health issues resulting from a Parkinson's disease diagnosis in 2022.

The defendant also has a history of mental and emotional health concerns that he has attempted to manage through prescribed medications over the past 20 years. The defendant has had psychiatric assessments and has attended mental health treatment and programming over the years, but his mental health is fairly well controlled when he is in treatment and adhering to his medications.

The defendant has a significant history of alcohol abuse throughout his life, and it has resulted in driving-while-impaired convictions. The defendant has

participated in and completed outpatient treatment programs for alcohol abuse, and while incarcerated in county jail was placed on an alcohol withdrawal protocol. The defendant noted, however, that alcohol was not a contributing factor for his current offense of conviction as he was sober during the incident.

The defendant never graduated from high school, has no record of military service, and had steady employment from 1990 until 2010 when he filed for disability.

3. Needs of Sentencing and Other 3553(a) Factors

A sentence of 14 months' imprisonment is also warranted by the needs of sentencing and other Section 3553(a) factors. While some mitigating factors exist, such as the defendant's somewhat dysfunctional upbringing, physical abuse while a youth, and mental health concerns, aggravating factors also exist that warrant consideration and weight such as the extremely serious and dangerous nature of the offense and his resort to political violence against those with whom he disagrees rather than resort to the ballot box. The rash of political violence in the nation and in the District warrant a sentence of 14 months to help deter the defendant and others from continuing this troubling and dangerous trend. *See United States v. Godfrey*, 668 F. App'x 201, 203 (8th Cir. 2016) (per curiam) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") (quoting *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010)).

On balance, a sentence of 14 months' imprisonment would serve the needs of sentencing to reflect the seriousness of the offense, to promote respect for the law, to

provide just punishment for the offense, to afford adequate deterrence, to avoid sentencing disparities, and to protect the public from further crimes of the defendant. The United States also agrees with the recommended conditions of supervision specified in the PSR.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 14 months' imprisonment, including the conditions of supervision recommended by the PSR.

Respectfully submitted,

Dated: September 3, 2026

DANIEL N. ROSEN
United States Attorney

/s/ *Benjamin Bejar*

BY: BENJAMIN BEJAR
Attorney ID No. 0351131
Assistant United States Attorney
District of Minnesota